**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Annette Ehrlich, | ) | CASE NO. 1:14 CV 2560 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Medina County Auditor, et al., | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendant. | ) | |

### INTRODUCTION

This matter is before the Court upon Defendants Medina County, Ohio and Medina County, Ohio Commissioners' Motion for Summary Judgment (Doc. 93) and Defendants Michael Kovak and Joan Heller's Motion for Summary Judgment (Doc. 94). Also pending is the Auditor Defendants' Motion to Strike Evidence (Doc. 107). This case arises out of plaintiff's termination from employment. For the reasons that follow, summary judgment is granted in favor of Kovack with respect to count two. The Court declines to exercise supplemental jurisdiction over the remaining state law claims. The motion to strike is MOOT, with the

1

exception of evidence regarding pornography, which the Court will consider.

FACTS

Plaintiff, Annette Ehrlich, brings this lawsuit against defendants, Medina County, Ohio ("Medina County"), Medina County, Ohio County Commissioners ("County Commissioners"), Medina County Auditor Michael Kovack, and Joan Heller, alleging wrongdoing in connection with plaintiff's termination from employment.

Kovack is the duly elected Auditor of Medina County and defendant Heller was Kovack's chief deputy during the relevant time period.  Plaintiff was employed by the Medina County Auditor's Office ("Auditor's Office") as a network administrator.  Plaintiff began working in that position on January 31, 2005.  The position is exempt from competitive classified service and is considered a "fiduciary" position.  Plaintiff was principally responsible for the efficient and secure operation of the network at the Auditor's Office.   Plaintiff's job duties also included maintaining the passwords to all Auditor's Office employees' email accounts.   In addition, plaintiff's job duties included reporting any security breach to a supervisor, *i.e.*, Lisa Nichols.   Plaintiff also had the authority to speak on behalf of the Auditor's Office on issues related to information technology ("IT") and further made IT-related recommendations to Kovack to assist him in his decision-making process.

In September of 2013, plaintiff learned that Kovack was using the printer in the Auditor's Office to print fliers for a campaign event in October of 2013.  Subsequently, in February of 2014, plaintiff reviewed the print logs for the Auditor's Office and discovered that Kovack had used the Auditor's Office printers to print approximately 150 copies related to Kovack's chili cook-off.  She then reviewed the print logs for October of 2013 and learned that Kovack made

2

approximately 200 copies related to his 2013 campaign.  In all, plaintiff estimates that Kovack made 1,000 copies for personal reasons.

In March of 2014, plaintiff asked if she could attend a training session related to a software program called Pictometry.  According to Kovack, Pictometry was a simple end user software program that the Auditor's Office had used for years.  Kovack and Heller believed that Kovack should not attend the training session and, as such, they denied her request.  On March 7, 2014, plaintiff wrote Kovack the following email:

> I will be taking vacation to attend this training that I helped set up. I am unsure why you are so vehemently adamant that I be banned from this training. This has happened before with pricing in MVP. I was denied the opportunity for training right here at our office but then I had to answer  pricing questions first from Kathy who had the training and then from Jim. In fact, he was asking me questions about pricing just this week.

Kovack believed the tone of the email was insubordinate and decided to discipline plaintiff.  On March 14, 2014, Heller prepared a Notice of Pre-Disciplinary Hearing.  In the meantime, on March 19, 2014, plaintiff hand delivered a lengthy letter to Kovack.  The letter raises a number of issues and primarily focuses on the "hostile" work environment that plaintiff believes exists at the Auditor's Office.  Plaintiff claims that both Kovack and Heller have shut her out of meetings and refused to allow her to perform her job.  She claims that work is causing her intense anxiety and that she can no longer eat at work.  In addition, the letter provides:

> I also wanted to point out that in February, through checking of the print logs on the print server, which I do regularly to make sure the printers are working properly, I noticed that you were printing your Chilli Cook off campaign literature from the printers here in the office. I have been so upset over it and I don't know how to address it considering how I have been treated by both you and Joan.  I constantly fear for my job and so I did not disclose this to anyone.  However, I believe it is wrong to do that. This must be addressed, as this knowledge is causing me so much emotional distress.

On March 20, 2014, the Notice of Pre-Disciplinary Hearing was hand delivered to

3

plaintiff and a meeting occurred.  At the meeting plaintiff questioned whether Heller would retire, and Heller responded that she was never going to leave.  Heller recommended that plaintiff contact the employee assistance program because of her stress.  According to Heller, plaintiff signed the form and threw it at Heller.  Lisa Nichols was also present at this event.  Her written account contains no mention of plaintiff having thrown the notice at Heller.  That same day, plaintiff contacted the Sheriff's Office via letter regarding Kovack's use of the printers for his campaign.  The letter also mentions the fact that in 2011, plaintiff discovered pornography on Kovack's county laptop.[1]

Subsequently, Heller sent plaintiff an email later that day in which Heller requested that plaintiff change Heller's password to "never leave."  Heller testified that her actions were mean and were intended to taunt plaintiff.  Heller claims that on the following day, she gave plaintiff her pay stub and plaintiff  "violently grabbed" it from Heller's hand.  Heller claimed that she felt threatened by plaintiff's outbursts.

Ultimately, plaintiff received a written reprimand for her conduct regarding the March 7th email she sent to Kovack concerning the Pictometry training.  Pursuant to the personnel manual, the written reprimand was expunged from her personnel file after six months.

According to plaintiff, after getting yelled at by Heller regarding the training, plaintiff

---

[1]  Plaintiff notes in her brief that she believes that Kovack misused his position as Auditor by switching the stickers on the gasoline pumps in an effort to help Heller win an election.  There is simply no indication, however, that plaintiff engaged in *any* speech on this issue. Therefore, the Court need not reach defendants' argument that this evidence should be stricken as impermissible prior bad acts.  The Court will, however, consider evidence regarding the pornography to the extent plaintiff reported this "misuse" to the Sheriff.

4

reviewed the network and discovered that Kovack maintained a number of files related to his campaign, including "chili cook-off files and donor lists and campaign lists and letters to the editor."  Plaintiff contacted "a couple of different lawyers" regarding her concerns that Kovack was committing a felony by misusing county resources.  At her deposition, plaintiff testified that she did not report her concerns regarding Kovack's use of the county printers to anyone else at the Auditor's Office because she was afraid of Kovack and Heller.[2]  She did testify, however, that she informed Holly Muren and Chris Jakab, who are not employed by the Auditor's Office.

In response to plaintiff's March 19th letter raising allegations of a hostile work environment, Kovack formed a committee to investigate plaintiff's claims.  The three-member committee, which consisted of Auditor's Office employees, determined that plaintiff had not been subjected to a hostile work environment.  Rather, the committee met with plaintiff and plaintiff provided a list of events that she believed resulted in a hostile work environment.  All of these issues relate to interactions with Heller on various personnel matters, including the Pictometry training and the password change.  Although acknowledging that the events give rise to an "unpleasant or undesirable work environment," and stem from a personality conflict between plaintiff and Heller, they did not rise to the level of creating a hostile work environment.  Kovack testified that he also informed the sheriff of plaintiff's allegations.

_____

[2] In apparent contradiction to her deposition testimony, plaintiff offers her own affidavit in which she now purports to aver that on either March 7th or 8th, plaintiff orally notified Lisa Nichols about Kovack's use of county resources for personal and campaign purposes.  Defendants move to strike plaintiff's affidavit.  The Court need not reach this issue because the reporting of the "wrongful acts" relates to plaintiff's state law whistleblower claim, over which this Court declines to exercise supplemental jurisdiction.

On June 6, 2014, Kovack contacted Michael D. Warner, who works with computer servers. In response, Warner sent the following email:

> I apologize for missing your voicemail regarding assisting with the transition of your IT administrator.  If the opportunity is still available, please let me know and I would be happy to help in any way that I can. We are more than happy to be a resource to our clients in any way that we can support them either on a full time or part time basis.

Kovack testified that, although he had no plan to terminate plaintiff at this point, he was concerned that if she left employment, the Auditor's Office would need a contingency plan. Kovack testified that he believed he had an "unstable" personnel situation.

In July of 2014 plaintiff requested leave under the Family Medical Leave Act ("FMLA"). The physician's note accompanying the request indicates that leave is required as a result of stress-related symptoms and because plaintiff's mother required care stemming from her cancer diagnosis.

At some point, Kovack became concerned that a leak existed in the Auditor's Office.  He claims that a press release was issued by Medina County Commissioner Pat Geissman.  The press release contained a "whole host" of allegations against Kovack, including allegations surrounding his use of county resources in relation to the chili cook-off.  Kovack could not recall when this occurred and could not say whether it occurred before or after plaintiff began FMLA leave.  Plaintiff was scheduled to return to work on August 25, 2014.  On that date, Kovack prepared a letter placing plaintiff on paid administrative leave:

> Due to Amy Murray's scheduled vacation time last week we are not quite prepared for you to return to work this week.  Accordingly, I am granting you one week of paid administrative leave to allow us to complete preparations for your return....

Kovack testified that he was concerned about the leaking of information, specifically the chili cook-off information.  He testified that he wanted Amy Murray to limit plaintiff's access to

the computer system before plaintiff's return to work.   Kovack later extended her leave via letter

dated August 29, 2014:

> Based on several Incidents which occurred immediately prior to your FMLA leave, I
> have some concerns I would like to address prior to granting you access to the data center
> and our network. Accordingly, I am placing you on paid administrative leave until further
> notice.
>
> Please report to the auditor's office conference room on Friday, September 5th at 9:00
> am. At that time I hope to discuss some of those concerns with you.

Plaintiff and Kovack met on September 5th, at which point Kovack claims that plaintiff

admitted that she provided information from the Auditor's Office to Commissioner Geissman.

It is not clear whether plaintiff provided the information directly.  Anne Murphy, an individual

formerly employed by the Auditor's Office, testified that plaintiff gave her a copy of Kovack's

hard drive in the form of a disc over "the summer" of 2014.  Murphy then informed plaintiff that

Murphy would provide the copy of the hard drive to Geissman.  It appears that Geissman may

have been Kovack's political adversary.  At the time plaintiff provided the disc to Murphy,

Murphy no longer worked for the Auditor's Office.  Following the meeting, plaintiff remained

on paid administrative leave, but was not given a return to work date.

On September 17, 2014, plaintiff was contacted by a newspaper reporter.  According to

plaintiff, the reporter had a discussion with Heller.  Heller informed the reporter that plaintiff had

badly injured Heller's hand and further indicated that Heller was afraid of plaintiff.  According

to plaintiff, the reporter learned this information as a result of reviewing plaintiff's personnel

file.  According to Heller, she provided plaintiff's personnel file to the reporter in response to a

records request.[3]

The following day, plaintiff came to the Auditor's Office along with her muzzled dog and requested a copy of her personnel file.  Heller testified that plaintiff's behavior was "off balance, agitated, angry."  She indicated that plaintiff sat in a chair approximately eight feet from Heller and occasionally became loud and disruptive.  Then, plaintiff would pet her dog, which had a calming effect on plaintiff and the pattern would repeat itself.  There were a significant number of witnesses to this incident.  Kovack received text messages and cell phone calls from employees regarding the incident.  The employees reported to Kovack that plaintiff was "causing a scene and threatening" Heller.   Kovack instructed the witnesses to prepare statements regarding the incident.  In connection with this case, sixteen witnesses offer affidavits describing the incident.  The majority of witnesses testified that they felt threatened by plaintiff's behavior, although no witness points to a particular act that plaintiff committed.  In addition, a number of witnesses indicated they were afraid of the muzzled dog that plaintiff brought with her to the Auditor's Office.  The vast majority further described plaintiff's behavior as "loud, demanding, agitated, angry, scary or discourteous."  All witnesses indicated that they believe her behavior warranted immediate dismissal.  These affidavits are consistent with the statements that many of the affiants prepared on the day of the incident.  On the other hand, plaintiff denies that she engaged in any threatening behavior.  Rather, plaintiff claims that Heller was verbally attacking her.  In addition, plaintiff testified that at one point plaintiff became fearful that Heller would hit

---

[3]      These facts are relied on for background purposes only. Defendants move to strike this testimony on the grounds that it is hearsay and cannot be relied on to establish plaintiff's defamation claim.  As set forth below, the Court declines to exercise supplemental jurisdiction over the defamation claim.

8

her.  Plaintiff further disputes the statements made by the affiants and further indicates that she believes at least one affiant was not actually present when the incident occurred.

Later that afternoon, Heller applied for a civil stalking order against plaintiff.  According to Heller, the Magistrate informed her that the incident could become a public record and plaintiff's medical records could be part of that record.  Heller testified that she did not want plaintiff's medical files released and, as such, Heller voluntarily dismissed her request.

After reviewing the statements and discussing the incident, Kovack determined that plaintiff's conduct warranted discipline.  Kovack sent a Pre-Disciplinary Hearing letter to plaintiff on September 19, 2014, which set a hearing for September 25, 2014.  In the letter, Kovack indicated that during the incident with Heller, plaintiff "became irate, confrontational, loud and disruptive."  Kovack described plaintiff's conduct as a category 3 violation which may subject her to termination.  Plaintiff notes that Kovack did not indicate in the letter that plaintiff acted in a threatening manner.  Plaintiff further notes that this is the same type of misconduct for which plaintiff was previously disciplined.  It is unclear what transpired at the hearing on September 25th.  On September 26, 2014, Kovack determined that plaintiff's conduct warranted termination.

This lawsuit followed.  Plaintiff filed five claims for relief.  Count one is a claim for violation of Ohio's Whistleblower Act and is asserted against all defendants.  Count two is a claim for violation of 42 U.S.C. § 1983 for terminating plaintiff in violation of the First Amendment.  This claim was asserted against all defendants with the exception of Heller.  The Court previously granted judgment on the pleadings in favor of all defendants except Kovack in his individual capacity.  Thus, count two remains pending against Kovack only.  Count three is a

claim for defamation, which is asserted against Heller only.  The Court previously determined that plaintiff could not assert a claim for defamation for statements made by Heller to the Medina Court of Common Pleas in connection with the filing of her stalking petition.  Count four is a claim for malicious prosecution and is asserted against Heller and count five is a claim against all defendants for intentional infliction of emotional distress.

Defendants now move for summary judgment with respect to all claims and plaintiff opposes the motions.

### **STANDARD OF REVIEW**

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed .R.Civ.P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remain unchanged" and the amendment "will not affect continuing development of the decisional law construing and applying" the standard.  See, Fed.R.Civ.P. 56, Committee Notes at 31.

10

Accordingly, summary judgment is appropriate when no genuine issues of material fact

exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local

600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine

issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with affidavits," if any, which it believes demonstrates the
> absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution

will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party.  The court must afford all reasonable inferences and construe the evidence in

the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d

146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759

F.2d 557, 562 (6th Cir. 1985).  However, the nonmoving party may not simply rely on its

pleading, but must "produce evidence that results in a conflict of material fact to be solved by a

jury."  *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Accordingly, "the mere existence of a

scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence

on which the jury could reasonably find for the plaintiff."  *Copeland v. Machulis*, 57 F.3d 476,

11

479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**ANALYSIS**

A.  Count two (Section 1983 First Amendment retaliation claim)

To maintain a claim under Section 1983, a plaintiff must establish that she was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct 2250, 101 L.Ed.2d 40 (1988); *Simescu v. Emmet County Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991). Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). The first step in any such claim is to identify the specific constitutional right allegedly infringed. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Baker*, 443 U.S. at 140.

When a Section 1983 claim is based on First Amendment retaliation, a plaintiff must establish that she: (1) engaged in constitutionally protected conduct; (2) suffered an adverse action that would deter a person of ordinary firmness from continuing to engage in the conduct; and (3) the adverse action was motivated at least in part by the conduct.  *Fritz v. Charter Twp. Of Comstock*, 592 F.3d 718, 723 (6th Cir. 2010).

Defendant argues that he is entitled to summary judgment on this claim because plaintiff cannot establish that she engaged in constitutionally protected conduct.  According to defendant, plaintiff's position qualifies under the *Elrod/Branti* exception.  Defendant also argues that

12

plaintiff's speech is "duty speech" and, as such, plaintiff has no First Amendment claim.  To the extent plaintiff engaged in constitutionally protected conduct, defendant argues that plaintiff cannot show a casual connection between her termination and the protected conduct.

      1.  Constitutionally protected conduct

          a.  *Elrod/Branti*[4]

In her complaint, plaintiff alleges that she engaged in protected speech by sending the March 19th letter to Kovack in which she informed him that she knew he was using the Auditor's Office printers for his campaign.  In addition, she claims that her March 20th letter to the Sheriff's Office constitutes protected speech.

The Sixth Circuit employs a two-part inquiry to determine whether the employee engaged in protected First Amendment conduct.  *See e.g., Rose v. Stephens*, 291 F.3d 917, 920 (6th Cir. 2002); *Latham v. Office of the Attorney General of the State of Ohio*, 395 F.3d 261, 265 (6th Cir. 2005). The threshold question is "whether the employee's 'speech may be fairly characterized as constituting speech on a matter of public concern.'" *Rose*, 291 F.3d at 920

---

[4]      The Court notes that this case was previously assigned by the consent of the parties to Magistrate Judge White, who issued a thorough Opinion in connection with defendants' motion for judgment on the pleadings.  Upon the retirement of Magistrate Judge White, the parties declined to consent to the jurisdiction of the newly assigned Magistrate Judge.  Therefore, the case is now before this Court.  The Court notes, however, that much of the relevant law set forth herein was previously set forth in the Opinion issued by Judge White.  The analysis differs, however, in that Magistrate Judge White was limited to the allegations in the pleadings.  This Court is not so limited and will consider the factual matter presented to the Court in connection with the parties' briefing.

13

(quoting *Dambrot v. Central Michigan University*, 55 F.3d 1177, 1186 (6th Cir. 1995)). *See also Silberstein v. City of Dayton*, 440 F.3d 306, 318 (6th Cir. 2006). If the speech relates to a matter of public concern, the court employs the balancing test set forth in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), "to determine if the employee's free speech interests outweigh the efficiency interests of the government as an employer." *Rose*, 291 F.3d at 920.

However, "[w]hile *Pickering* provides the basic framework for analyzing a § 1983 First Amendment claim, this circuit employs a different test when a claim is brought by an employee who held a policymaking or confidential position." *Silberstein*, 440 F.3d at 319. Specifically, in *Rose* the Sixth Circuit held that "where a confidential or policymaking public employee is discharged on the basis of speech related to [her] political or policy views, the *Pickering* balance favors the government as a matter of law." *Rose*, 291 F.3d at 921. As another Court in this District observed, "[t]his holding is an extension of the *Elrod/Branti* line of cases, in which the Supreme Court recognized that, although patronage dismissals ordinarily are unconstitutional, a public employer may terminate a public employee in a policymaking or confidential position solely because of her political affiliation without violating the First Amendment." *Marsilio v. Vigluicci*, 924 F.Supp.2d 837, 849 (N.D. Ohio 2013).  Pursuant to *Rose*, the presumption in favor of the government in the *Pickering* analysis applies not only to patronage dismissals but also when "a confidential or policymaking public employee is discharged on the basis of speech related to his political or policy views."

The Supreme Court has observed that "no clear line can be drawn between policymaking and non-policymaking positions." *Elrod*, 427 U.S. at 367. In an effort to clarify this

14

determination, the Sixth Circuit has articulated four categories of employees who will always fall within the *Elrod/Branti* policymaking or confidential employees exception. Defendants argue that plaintiff's position falls under category three, which consists of:

> confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors.

*Latham*, 395 F.3d at 267 (citing *McCloud v. Testa*, 97 F.3d 1536, 1557-1558 (6th Cir. 1996)).

"The *Elrod–Branti* exception is to be construed broadly, so as presumptively to encompass positions placed by the legislature outside of the 'merit' civil service. *Peterson v. Dean*, 777 F.3d 334, 342 (6th Cir. 2015)(internal quotation and citation omitted). "Consequently, if there is any ambiguity about whether a particular position falls into any of [the four categories] (and so also within the *Branti* exception), it is to be construed in favor of the governmental defendants when the position at issue is unclassified or non-merit under state law...." *Id.*

Defendant claims that plaintiff was a network administrator, which is a "policymaking or confidential" position. According to defendant, Kovack is a category one employee and plaintiff is an employee who "controls the lines of communication" to Kovack. Defendant points out that plaintiff had the passwords for Kovack's email account and had the ability to access his email. Kovack further had the ability to access Kovack's network files and copy the contents thereof. In addition, defendant notes that plaintiff's position was necessary to ensure that the network at the Auditor's Office operated securely and efficiently. As such, defendant claims that plaintiff controlled the means of Kovack's electronic communication. Because plaintiff had unfettered

15

access to all files and emails on the network, she constitutes a "confidential" employee and, therefore, her speech was not protected under *Elrod/Branti*.

In response, plaintiff argues that the network administrator has no authority to make policy decisions on behalf of the Auditor's Office.  Plaintiff further notes that she never advised Kovack on how to exercise his policymaking authority.[5]  According to plaintiff, she had no authority to control the lines of communication to or from Kovack.  She did not control his calendar or email.  Plaintiff did not answer the phone or maintain any other similar duties. Plaintiff testified that, although she maintained the passwords to Kovack's email address, the only way she could access his email was by accessing Kovack's actual computer.   In other words, plaintiff claims that although she could theoretically access Kovack's email, this access does not rise to the level of "controlling" lines of communication found sufficient to be considered a "confidential" employee for purposes of *Elrod/Branti*.

Upon review, the Court finds that plaintiff is a category three employee and, therefore, she is subject to the *Elrod/Branti* exception.  As defendant points out, plaintiff maintained the passwords for and could access Kovack's email account, as well as all of the network files.  The Court further notes that the testimony demonstrated that plaintiff read the contents of Kovack's laptop and "cleaned" his computer of viruses and other materials as part of her job duties.

_____

[5]      Defendants move to strike this aspect of plaintiff's affidavit. According to defendants, plaintiff's deposition testimony provides that she participated on the County Data Board and, as such, she held a "policymaking" position.  The Court need not reach defendants' argument in that defendant did not rely on plaintiff's role as a "policymaker" in his motion for summary judgment. Rather, the argument was limited to plaintiff's role as an employee who "controlled the lines of communication."

Plaintiff testified that she bore responsibility for ensuring that the network at the Auditor's Office operated securely and efficiently.[6]  In this position, plaintiff had ultimate control over the electronic lines of communication and, therefore, qualifies as a category three employee.

Although the Court agrees with plaintiff that the issue presents a close call in that plaintiff does not appear to routinely "control" lines of communication in the traditional sense, the Court notes that pursuant to *Rose*, the balance weighs in favor of the government.  Although there may be some ambiguity as to whether a network administrator who maintains complete control over the efficient workings of an elected official's computer network, including email communication, rises to the level of a category three employee, the classification of plaintiff's position tips the scale in favor of the government.  As noted above, " if there is any ambiguity about whether a particular position falls into any of [the four categories] (and so also within the *Branti* exception), it is to be construed in favor of the governmental defendants when the position at issue is unclassified or non-merit under state law...." *Id.*  Here, plaintiff's offer letter indicated that her position qualified for non-classified service pursuant to O.R.C. § 124.11(A)(9), which provides:

> (A) The unclassified service shall comprise the following positions, which shall not be included in the classified service, and which shall be exempt from all examinations required by this chapter:
>
> (9) The deputies and assistants of state agencies authorized to act for and on behalf of the agency, or holding a fiduciary or administrative relation to that agency and those persons employed by and directly responsible to elected county officials or a county administrator and holding a fiduciary or administrative relationship to such elected county officials or county administrator, and the employees of such county officials whose fitness would be

---

[6]    The Court notes that plaintiff did in fact copy Kovack's hard drive and disseminate the contents thereof outside of the Auditor's Office.

impracticable to determine by competitive examination....

Thus, assuming *arguendo* that some ambiguity exists as to whether plaintiff's position qualified as a category three position, the Court is to construe the *Elrod–Branti* exception broadly, "so as presumptively [] encompass positions placed by the legislature outside of the 'merit' civil service."  *Peterson v. Dean*, 777 F.3d 334, 342 (6th Cir. 2015)(internal quotation and citation omitted).  Here, any ambiguity is resolved in favor of the government in that the Ohio legislature denoted the position to be non-classified.

Having concluded that plaintiff's *position* falls within the *Elrod/Branti* exception, the Court turns to whether plaintiff engaged in speech related to "political or policy views."  In *Rose*, the Sixth Circuit analyzed three approaches taken among the circuits in connection with this issue.  The first approach, *i.e.*, the narrowest, affords a presumption in favor of the government based on political affiliation only.  The presumption therefore does not apply to speech.  Under the second approach, the presumption applies to political affiliation and speech, but only speech that is "political or policy-based."  Courts following the third approach determine only whether the employee holds a "policymaking or confidential" position.  If so, the inquiry ends and the government is entitled to the presumption.  The Sixth Circuit adopted the second approach.

In *Rose*, the Court described the purpose of this element:

When such an employee speaks in a manner that undermines the trust and confidence that are central to his position, the balance definitively tips in the government's favor because an overt act of disloyalty necessarily causes significant disruption in the working relationship between a confidential employee and his superiors. The additional restriction that this presumption applies only to cases where the employee speaks on political or policy issues ensures that the content of the employee's speech directly implicates the loyalty requirements of the position and thus will adversely affect a central aspect of the working relationship in all cases.

Although a close call, the Court finds that plaintiff's speech directed at the misuse of

18

governmental property is not speech related to "political or policy" issues.  Speech related to the

misuse of governmental property, which may constitute criminal activity, is not speech that

relates to a "political or policy" issue that would require *political* loyalty. Plaintiff is not

criticizing or expressing disagreement with policies implemented by Kovack or positions he

takes as County Auditor.  Because plaintiff's speech does not implicate either her political

position or her substantive policy views, the *Elrod/Branti* exception does not afford a

presumption in favor of the government.  *See, Marshall v. Porter County Plan Commission*, 32

F.3d 1215 (7th Cir. 1994)(government not entitled to presumption where plaintiff spoke out

regarding defendant's excessive mileage and failure to conduct inspections)[7]; *Roupe v. Bay

County*, 268 F.Supp.2d 825 (E.D. Mich. 2003)(speech regarding whether County Commissioner

attended work was not "political or policy" speech).  As such, the traditional *Pickering* analysis

applies to plaintiff's claim and summary judgment is not appropriate based on *Elrod/Branti*.

b.  Duty speech

The Supreme Court has explained that "the First Amendment protects a public

employee's right, in certain circumstances, to speak as a citizen addressing matters of public

concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). *See

also Connick v. Myers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). To establish

that speech is constitutionally protected, a public employee must show, among other things that

her speech was made as a private citizen, rather than pursuant to her official duties.  *Handy-Clay

v. City of Memphis, Tenn.*, 695 F.3d 531, 540 (6th Cir. 2012).

---

[7]     In *Rose*, the Sixth Circuit cited the Seventh Circuit's approach
with approval.  Accordingly, the Court relies on these cases in
addressing this element.

19

...[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

Defendant argues that plaintiff's speech was "duty speech" and, therefore, protected by the First Amendment.  According to defendant, plaintiff testified that part of her job duties include reporting any misuse of the network by anyone employed at the Auditor's Office.  On the other hand, plaintiff argues that although her discovery of defendant's misuse of the network came as a result of her job duties, her reporting the misuse to the Sheriff was outside the "chain of command," and thus constitutes protected speech.

Upon review, the Court agrees with defendant in part.  Here, plaintiff unequivocally testified that part of her job duties included reporting misuse of the Auditor's network:

Q Okay. So it is -- so a part and parcel of your duties at the auditor's office when  you worked there was to report inappropriate  use of the network by auditor employees?

A Yes.

Q Thank you. And when we're talking about, just so that I make sure that I understand what you're saying, inappropriate use of the network would be any use, whether you're using the hardware or the software, right?

A Yes.

Thus, plaintiff's March 19th letter in which she reported to Kovack her belief that he misused the printers in the Auditor's Office is "duty speech" as her job duties required her to engage in such speech.[8]  As such, plaintiff cannot base a First Amendment claim on the letter she sent to Kovack.

On the other hand, the Court agrees with plaintiff that her March 20th letter to the Sheriff

---

[8]      There is no evidence that Kovack's printer was not part of the network.

regarding the potential criminal misuse of the network does not qualify as "duty speech."  There is simply no indication that plaintiff's job duties required her to report on the misuse of the network to individuals outside the chain of command.  To the contrary, plaintiff testified that her job duties required her to report any misuse to her supervisor:

> Q.  I see. Okay. If you found as the network administrator inappropriate use of the network by one or more of the Medina County Auditor employees, would you report that to the engineers' office or would you report that to Joan or Mike or someone else?
>
> A I would report it to my supervisor as I was required.

Because there is no indication that plaintiff's letter to the Sheriff was written as part of her duties as the network administrator of the Auditor's Office, summary judgment is not warranted on this aspect of plaintiff's claim.  *See, e.g. Handy-Clay*, 695 F.3d at 542 (noting that speech undertaken to individuals outside of plaintiff's department were "clearly" not part of plaintiff's official duties).

### 2.  Adverse action

The parties do not dispute that plaintiff's termination from employment constitutes an adverse action.

### 3. Causal connection

Plaintiff must demonstrate that the speech at issue "represented a *substantial or motivating* factor in the adverse employment action."  *Vereecke v. Huron Valley School Dist.*, 609 F.3d. 392 (6th Cir. 2010)(citations and quotations omitted)(emphasis supplied).  The Sixth Circuit has interpreted this "inquiry to mean that a motivating factor is essentially but-for cause–without which the action being challenged simply would not have been taken."  *Id*.  A burden shifting analysis applies in assessing this aspect of plaintiff's claim:

> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant.  If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

*Leonard v. Robinson*, 477 F.3d 347, 366 (6th Cir. 2007).

Bare allegations of malice are insufficient to establish a constitutional claim.  Circumstantial evidence, however, including the "timing of events or the disparate treatment of similarly situated individuals is appropriate."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999).

With regard to temporal proximity, "substantial case law from this circuit cautions about the permissibility of drawing an inference of causation from temporal proximity alone."  *Vereecke*, 609 F.3d at 400.  "The more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with other evidence of retaliatory conduct to establish causation."  *Id.* (Citations and quotations omitted).  "Incidents of misconduct that do not rise to the level of an adverse employment action may be relevant at trial to show a pattern of mistreatment on the job based on plaintiff's protected activities."  *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 305 (6th Cir. 2012).

Here defendant argues that there is no evidence that plaintiff's speech was the "but for" cause of her termination.  Rather, the evidence establishes that plaintiff was terminated for her own misconduct stemming from the September 18th incident.  Defendant further notes that plaintiff's termination occurred six months after her protected speech, which is not closely related in time for purposes of establishing causation.  With respect to causation, plaintiff's response in its entirety consists of the following:

> Kovack was seeking to replace [plaintiff] as early as June, 2014 after [plaintiff] reported

22

Kovack's illegal actions.  In addition, Kovack did not allow [plaintiff] to come back to work after [plaintiff's] FMLA leave citing [plaintiff's] alleged wrongdoing regarding the release of [Auditor Office] computer information.  However, Kovack did nothing to substantiate his unfounded assumptions.

Upon review, the Court agrees with defendant and finds that Kovack is entitled to summary judgment.  Here, plaintiff's speech occurred in March of 2014 and she was terminated in September.  Because a six month time lapse is on the outer edges with regard to temporal proximity, plaintiff must supplement her claim with other evidence of retaliatory conduct.  *See*, *Benison v. Ross*, 765 F.3d 649, 661 (6th Cir. 2014).  Here, plaintiff points to two facts that she claims sufficiently establish that her speech was a motivating factor in the decision to terminate her employment.  The Court finds that these facts, coupled with the six month time lapse, are insufficient to satisfy plaintiff's burden.  As an initial matter, plaintiff notes that Kovack was "seeking" to replace plaintiff shortly after she engaged in protected speech.  Kovack, however, testified that he sought possible assistance from an individual named Michael D. Warner regarding the Network Administrator position because of concerns that plaintiff would leave employment.  There is simply no other evidence pertaining to this issue before the Court.  Plaintiff does not claim that Warner ever performed any work for defendant at any point in time.  Thus, the Court does not find this email to be particularly relevant to whether plaintiff's speech was a factor motivating her termination.

Plaintiff further relies on the fact that Kovack placed plaintiff on paid leave after she sought to return from FMLA leave.  Plaintiff, however, cites no specific testimony in support of her position.  Rather, plaintiff cites the Magistrate Judge's ruling.  In that Opinion, however, the Magistrate Judge relied on plaintiff's *allegation* that Kovack placed her on leave because she "had collected the information regarding Kovack that [plaintiff] previously provided to the

23

Medina County Sheriff."  Plaintiff cites no testimony, however, supporting the allegation that Kovack placed plaintiff on leave because she "collected" information that was reported to the Sheriff.

Rather, Kovack's testimony discloses his concern that information was being "leaked" from his office by plaintiff.  Press releases were issued that contained information from the Auditor's Office. Although this information did relate to, among other things, the misuse of the office printer, Kovack's concerns were justified.  Anne Murphy, an individual formerly employed by the Auditor's Office,[9] testified that plaintiff gave her a copy of Kovack's hard drive in the form of a disc over "the summer" of 2014.  Murphy then informed plaintiff that Murphy would provide the copy of the hard drive to County Commissioner Geissman.  It appears that Geissman may have been Kovack's political adversary.  According to Kovack, he met with plaintiff on September 5, 2014, to discuss his concerns regarding the release of information to Geissman.  Kovack testified that plaintiff admitted that she provided information to Geissman from the Auditor Office's computers.  Notably, plaintiff does not dispute that she disseminated the entire contents of Kovack's laptop outside the confines of the Auditor's Office.

Plaintiff summarily indicates that this is "direct" evidence.  The Court disagrees.  Kovack very clearly testified that he was concerned about a leak in his office because information fell into the hands of Geissman and ultimately the newspapers.   Because one would need to infer that plaintiff was placed on leave for her *speech*–as opposed to leaking information outside the office– the testimony requires an inference and, therefore, it is not direct evidence.  *Stansberry v.*

---

[9]     Murphy was not employed at the Auditor's Office at the time plaintiff provided Murphy with a disc containing a copy of the entire contents of Kovack's laptop.

*Air Wisconsin Airlines Corp.,* 651 F.3d 482 (6ᵗʰ Cir. 2011) (A statement is not direct evidence of discrimination if it requires an inference.); *Stockman v. Oakcrest Dental Center, P.C.*, 480 F.3d 791 (6ᵗʰ Cir. 2007) (same).

Following the September 5th meeting, it is undisputed that plaintiff brought her muzzled dog to the Auditor's Office with her on September 18th to request her personnel file.  As noted above, although the witnesses to the incident detail the account in varying ways, *all* of them indicate that plaintiff's behavior amounted to a terminable offense.  A number of witnesses testified that they feared both plaintiff and her dog, while others testified that they were concerned for their personal safety and felt threatened.  The vast majority described plaintiff's behavior as "loud, demanding, agitated, angry, scary or discourteous."

Plaintiff denies that she acted in a verbally or physically threatening manner.  She further points out that some employees, including Heller, were not fearful of her dog.  Plaintiff also notes that Heller could not point to a specific threat plaintiff made that day.  In addition, Heller did not accuse plaintiff of "threatening or menacing" Heller in connection with the civil stalking petition filed later that day.  Plaintiff also notes that Heller was able to complete the job of copying plaintiff's personnel file.

The Court finds that plaintiff's disagreement with the events on September 18th do not create a genuine issue of material fact.  As an initial matter, plaintiff offers only a simple denial with respect to the nature of her behavior that day.  This denial is insufficient to create a *genuine* issue of material fact given that all 15 witnesses to the incident averred that plaintiff's behavior was insubordinate at best.  Moreover, even assuming plaintiff believes she did not act in an inappropriate manner, all of these witnesses *perceived* plaintiff's behavior to warrant

termination. Although plaintiff notes that Heller did not point to a specific threat and was not fearful of plaintiff's muzzled dog, Heller testified that, "[i]n all the fifty years I've worked, I've never been afraid of anyone, and I was afraid of her that day...she was loud...she was disruptive...she was out of control." In essence, the evidence overwhelming establishes that by bringing her muzzled dog to the Auditor's Office and engaging in behavior perceived by all witnesses to range from discourteous or insubordinate to agitated, angry, or scary, plaintiff engaged in an otherwise terminable offense.[10]

Based on a totality of the evidence, the Court finds that no genuine issue of material fact exists with respect to causation. Here, like in *Veerecke*, "the absence of close temporal proximity and the presence of an obviously nonretaliatory basis for the defendants' decision amount to insufficient evidence to permit an inference of retaliatory motive."

B. Remaining claims

This Court, having dismissed all federal claims asserted in this case, declines to exercise supplemental jurisdiction over the remaining state law claims. *See Wellman v. Wheeling and L*

---

[10]    Plaintiff claims that the misconduct plaintiff was charged with falls under the same provision of the employee handbook at issue when Kovack disciplined plaintiff for sending the email regarding computer training. Notably, plaintiff does not dispute that her behavior in connection with the first discipline was unwarranted. To the extent plaintiff is claiming that her March speech must be a motivating factor because more serious discipline was imposed after the September 18 incident, the argument is rejected. Plaintiff points to no provision in the handbook requiring Kovack to impose the same discipline, or preventing him from terminating her for her behavior. This is especially so in that the conduct at issue differs significantly. In March, plaintiff received a written reprimand for sending an insubordinate email, while in September, plaintiff brought her muzzled dog to the office and behaved in a manner that caused several coworkers to feel threatened or unsafe.

*Lake Erie Railway Co.*, No. 97-3084, 1998 WL 25005, **4 (6th Cir. January 12, 1998)(*citing Gaff v. FDIC*, 814 F.2d 311, 319 (6th Cir. 1987)) ("We have long recognized a general rule disfavoring a district court's exercise of pendent jurisdiction when federal issues are dismissed before trial.").

### <u>CONCLUSION</u>

For the foregoing reasons, Defendants Michael Kovak and Joan Heller's Motion for Summary Judgment (Doc. 94) is GRANTED in PART.  Defendant Kovack is entitled to summary judgment with respect to count two.  The Court declines to exercise supplemental jurisdiction over the remaining state law claims.  The motion to strike is MOOT, with the exception of evidence regarding pornography, which the Court considered.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 11/30/16

27